| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | **NOT FOR PUBLICATION** |
| SARA BRECHER, on behalf of herself and all other similarly situated customers<br><br>                      Plaintiff,<br><br>– against –<br><br>MIDLAND CREDIT MANAGEMENT, INC., MIDLAND FUNDING, LLC, and ENCORE CAPITAL GROUP, INC.,<br><br>                      defendants. | **MEMORANDUM & ORDER**<br><br>18-CV-3142 (ERK) (JO) |

KORMAN, *J.*:

        Hoping to save some money while on a shopping excursion, plaintiff Sara Brecher signed up for an Old Navy credit card in November 2008. Brecher Aff. ¶ 5, ECF No. 23.[1] The cashier informed Brecher that she could use her credit account immediately, even without the yet-to-be-issued card, if she provided a photo ID and her social security number. *Id.* ¶ 6. Although Brecher claims she never received a physical credit card or any agreement associated with the account, she continued to use the account by providing her ID and social security number when she patronized Old Navy outlets. *Id.* ¶¶ 8-9. Brecher used the credit line with Old Navy for at least seven years, until 2015. *See* Koehler Aff. Exs. C, D, E, ECF No. 22-4; Koehler Supp. Aff. Ex. H, ECF No. 24-1. Nevertheless, she insists that, during that time, she never received "the credit card nor any agreement in the mail associated with an Old Navy account." Brecher Aff. ¶¶ 8, 24-25.

        When Brecher opened her Old Navy account, it was "serviced by GE Money Bank." Brecher Aff. ¶ 12. Since then, GE Money Bank has gone through a series of rechristenings.

---

[1] The following facts are taken from the Complaint, affidavits, and exhibits submitted with the parties' briefing. On a motion to compel arbitration, documents outside the pleadings may be considered. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019).

1

Specifically, in October 2011, GE Money Bank changed its name to GE Capital Retail Bank, and, in June 2014, it was rebranded once more as Synchrony Bank. Koehler Supp. Aff. ¶ 2 n.1. Then, in July 2016, Midland[2] acquired Brecher's credit card account from Synchrony Bank. Mulcahy Aff. ¶ 5 & Ex. A, ECF No. 22-5; Koehler Aff. ¶ 14 & Ex. F. As part of this transaction, Midland acquired various electronic records from Synchrony, along with the right to collect any outstanding debts and enforce the terms of the Agreement. Mulcahy Aff. ¶ 5-7 & Ex. B.

Shortly after Brecher signed up for the Old Navy account in 2008, Synchrony—operating at the time under the name GE Money Bank—mailed an agreement and credit card to her, although she claims she never received it. Koehler Aff. ¶ 6; Brecher Aff. ¶¶ 8. That agreement contained an authorization to change the terms of the agreement, an arbitration provision, and a class action waiver. Koehler Aff., Ex. A ("Initial Agreement"). The Initial Agreement bears the title "Old Navy Rewards Program Terms and Conditions," but defines "Old Navy" to include "all of its respective parents, subsidiaries, affiliates, predecessors, successors, assigns, employees, officers and directors." *Id.* Elsewhere, the Initial Agreement refers to Gap, Inc., Old Navy's parent, in various liability release provisions. *Id.* In 2012, Synchrony—at the time operating under the name GE Capital Retail Bank—mailed an updated agreement to Brecher containing both an arbitration provision and a class action waiver. *Id.* ¶ 7 & Ex. B ("Agreement"). The Agreement is titled "Gap, Inc. Credit Card Account Agreement," but governs "Old Navy Credit Card Accounts" as well. *Id.*

Brecher's Complaint centers on a collection letter she received from Midland in 2017 seeking to collect on her outstanding balance with Old Navy. Compl. ¶ 13, ECF No. 1; Brecher Aff. ¶ 10. Brecher alleges that the letter, which identified the amount owed as her "Current

---

[2] "Defendants" or "Midland" refers to Midland Credit Management, Inc., Midland Funding, LLC, and Encore Capital Group, Inc., collectively.

Balance" without "clearly stat[ing] either that the amount will or will not increase," Compl. ¶ 17, caused her "to suffer tremendous stress," Brecher Aff. ¶ 11, and constitutes a violation of the Federal Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA"). Specifically, she argues that the FDCPA "requires debt collectors . . . to disclose that the balance may increase due to interest and fees," Compl. ¶¶ 19, although she does not suggest that her balance ever increased, *see id.* ¶¶ 12-36. She filed this class action suit seeking statutory damages and attorney's fees. *See id.* ¶¶ 24-27, 37-47, 51-52; *see also* 15 U.S.C. § 1692k(a). Midland contends that Brecher agreed to resolve all disputes by arbitration and waived her right to proceed by class action. *See* Defs.' Br. 6-16, ECF No. 22-1. Brecher submits that she never received the relevant credit agreement, let alone assented to its arbitration and class action waiver provisions. *See generally* Pl.'s Br., ECF No. 23.

## DISCUSSION

The Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA "embod[ies] [a] national policy favoring arbitration and a liberal federal policy favoring arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quotation marks and citations omitted; second modification in original). But the FAA does not elevate agreements to arbitrate above other binding agreements. *Prima Paint Corp. v. Floo & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967). It places "arbitration agreements on equal footing with other contracts, but it does not require parties to arbitrate when they have not agreed to do so." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002) (quotation marks omitted). Accordingly, the first step in analyzing an arbitration agreement is to resolve "whether the parties agreed to arbitrate a dispute." *Id.* at 294 Specifically, it must be

determined, in accordance with state contract law, "whether such agreement exists between the parties." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017).

When the question of arbitrability arises in the context of a motion to compel arbitration, courts apply a standard akin to that on summary judgment. *Id.* at 74. All relevant, admissible evidence submitted by the parties is considered and all reasonable inferences are drawn in favor of the non-moving party. *Id.*; *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *see also* 9 U.S.C. § 4. If, however, undisputed facts establish arbitrability as a matter of law, further proceedings are unnecessary. *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011).

## I. Affidavit Admissibility

Preliminarily, Brecher challenges the admissibility of defendants' affidavits and attached exhibits submitted in support of their motion to compel arbitration. Specifically, Brecher contends that, while Midland's evidence could qualify as a business record under Federal Rule of Evidence 803(6), it lacks "sufficient indicia of trustworthiness" to be admitted. Pl.'s Br. 19 (quoting *Saks Int'l, Inc. v. M/V Exp. Champion*, 817 F.3d 1011, 1013 (2d Cir. 1987)).

Rule 803(6) permits the admission of a record that would otherwise qualify as hearsay if it "was made at or near the time by . . . someone with knowledge[,] . . . was kept in the course of a regularly conducted activity of a business, . . . [and] making the record was a regular practice of that activity." Fed. R. Evid. 803(6). These conditions must be "shown by the testimony of the custodian or another qualified witness." *Id.*

Midland offers two affidavits: Martha Koehler's and Sean Mulcahy's. Koehler's affidavit states that she is a Litigation Support Manager at Synchrony, has "personal knowledge of the business records of Synchrony," and is "authorized to declare and certify on behalf of Synchrony." Koehler Aff. ¶ 3. Her responsibilities include "regularly accessing and reviewing Synchrony cardholder records, maintaining and compiling histories of credit card account agreements, and reviewing and analyzing account records and transaction histories, including communication to and from cardholders." *Id.* ¶ 4. Moreover, she states that "records related to each account," such as the exhibits appended to her affidavit, "are made by . . . information transmitted by an individual with knowledge of the events described therein at or near the time of the event described in each record, and in the ordinary course of regularly conducted business activity." *Id.* ¶ 5.

Mulcahy's affidavit contains similar information. Mulcahy works for Midland as a "Media Team Manager," and is responsible for "maintaining and overseeing . . . loan agreements, debt collection records and other account information pertaining to accounts and debt that MCM manages for Midland." Mulcahy Aff. ¶ 3. He is "familiar with the recordkeeping practices and policies of [Midland]" and his affidavit is based on his "own personal knowledge or upon [his] review of the records of [Midland] maintained in the ordinary course of business, of which [he is] custodian." *Id.* ¶ 4. Mulcahy also avers that "[r]ecords related to [Brecher's] debt were made at or near the times of occurrence of the matters set forth by . . . a person having knowledge of these matters reflected in such records. These records are kept in the ordinary course of business activity conducted by [Midland]." *Id.*

Koehler and Mulcahy's affidavits and the attached exhibits are admissible. Both have demonstrated that they are qualified witnesses or custodians, that the statements are based on personal knowledge or their review of their respective employer's business records, and that the

5

documents were kept in the ordinary course of business, as required to lay a proper foundation for the admission of a business record. *See United States v. Komasa*, 767 F.3d 151, 156 (2d Cir. 2014).

Moreover, Brecher has failed to show that the proffered affidavits and exhibits lack trustworthiness. *See* Fed. R. Evid. 803(6)(E). Brecher wrongly attacks Koehler's affidavit as being prepared "specifically for this lawsuit." Pl.'s Br. 20-21. But the relevant question is not whether the affidavit is prepared for litigation. Most affidavits are because they lay the foundation for the actual evidence introduced. *See Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 691 (S.D.N.Y. 2014) (noting that "requirements for qualification as a business record can be met by . . . affidavits"). The question is whether the underlying documents are business records, and the exhibits here are. *See Biggs v. Midland Credit Mgmt., Inc.*, 2018 WL 1225539, at *4-5 (E.D.N.Y. Mar. 9, 2018) (deeming similar affidavits and exhibits admissible and collecting cases doing the same). The cases relied upon by Brecher are inapposite. For instance, *Webb v. Midland Credit Management, Inc.*, 2012 WL 2022013, at *4-5 (N.D. Ill. May 31, 2012), addressed whether third-party documents may qualify as business records. Here, however, there are no third-party records at issue. A representative of Synchrony proffered Synchrony's business records; a representative of Midland proffered Midland's.

In sum, both Koehler's and Mulcahy's affidavits and the attached exhibits are admissible, and I will consider them in deciding the instant motion.

## II. The Arbitration Agreement

Brecher's primary argument is that she never received, let alone agreed to, any contract with any of the defendants, and therefore is not bound by the arbitration and class action provisions. She also offers an array of other arguments, including that Midland is not a legitimate holder of her debts, *see* Pl.'s Br. 24-25, and that, even if she did assent to the Initial Agreement, she never

received notice or assented to the revised terms of the Agreement, *id.* 25-27. As an initial matter, though, the governing law must be identified because state law controls in determining whether an arbitration agreement exists. *See Meyer*, 868 F.3d at 73-74.

A. *Choice of Law*

Defendants assert that, per the Agreement's choice-of-law provision, *see* Koehler Aff., Ex. B, Utah law applies here, although they concede that the outcome of this case would be the same under either Utah or New York law, *see* Defs.' Br. 8. Brecher neither disputes this nor puts forth an argument as to which state law should govern. While her brief cites a mish-mash of decisions from various states, including a citation to the Utah Supreme Court, she predominantly relies upon New York law. *See generally* Pl.'s Br.

The choice-of-law provision in the Agreement does not govern "to resolve the contract formation issue" because doing so "would presume the applicability of a provision before its adoption by the parties has been established." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012). Like other contracts, the issue of an arbitration agreement's formation is "governed by the choice-of-law doctrine of the forum state, here, New York." *Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 46 (E.D.N.Y. 2017); *see also Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585, 590 n.7 (S.D.N.Y. 2001). But "if the relevant states' laws do not conflict, a choice of law analysis is unnecessary and the court may apply the forum state's law." 19 Wright & Miller, Federal Practice and Procedure § 4506 (3d ed. 2016); *see also Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (1993) ("The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved."). Indeed, I "may forgo an independent choice-of-law analysis if the parties have agreed, either expressly or tacitly, as to which state's laws should control" so long as "[t]he agreed-upon forum

7

[is] plausible and [has] some connection to the matter in suit." *Id.* (footnotes omitted); *see also Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("In the absence of substantive difference, . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.").

Here, Midland admits that Utah and New York law do not conflict, and Brecher tacitly asserts that New York law governs as her brief primarily relies upon it. *See Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001) ("The parties' briefs assume that New York substantive law governs the issue[] of contract interpretation . . . and such implied consent is . . . sufficient to establish the applicable choice of law."). Accordingly, while there is a potential conflict of laws here, there is no actual conflict. Thus, I will apply New York law.

B. *Existence of the Arbitration Agreement*

Brecher's central objection to Midland's motion to compel arbitration is that no agreement to arbitrate exists. In mounting this defense, she asserts, *inter alia*, that: "Midland cannot provide an agreement that [Brecher] agreed to," Pl.'s Br. 12; Brecher never signed any document, *id.* at 12-13; Midland cannot show that Brecher ever actually used the card, let alone that use would constitute consent, *id.* at 15; and there is no evidence that Brecher ever received, let alone assented to, any subsequent modifying agreements, *id.* All these scattershot assertions miss their mark.

*First*, Midland has sufficiently demonstrated that it mailed the Initial Agreement to Brecher and that she received it. Koehler's affidavit establishes that Synchrony—whatever its name happened to be when Brecher opened her account—"had a regular procedure of mailing, via United States Postal Service, the credit card and a copy of the credit card agreement that governed the account for each new Old Navy cardholder." Koehler Aff. ¶ 7. Moreover, "the aforementioned procedure was followed when [Brecher's] [a]ccount was opened" and the Initial Agreement was

8

"mailed to Sara Brecher at her address of record," *id.* ¶ 8, which matches Brecher's address on each of the statements sent to her, *compare id. with id.* Exs. C, D, E.

This sworn statement from Koehler is sufficient to establish that the Initial Agreement was mailed and Brecher received it. *Mount Vernon Fire Ins. Co. v. E. Side Renaissance Assocs.*, 893 F. Supp. 242, 245-46 (S.D.N.Y. 1995) (collecting New York state and federal cases holding that "[p]roof of mailing may be established . . . by showing that it was the regular office practice and procedure to mail such a letter"). "[M]ere denial of receipt does not rebut" the presumption that notice was received. *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985). The only evidence that Brecher offers that the letter was not actually mailed is that Koehler's affidavit states that the Initial Agreement was mailed on November 2, 2008—a Sunday. Brecher Aff. ¶ 28. As there is no mail service on Sunday, Brecher concludes that Koehler must be lying. *See* Pl.'s Br. 3. This contention reaches too far. Not only does Koehler's affidavit state "on or about November 2," *see* Koehler Aff. ¶ 8, but Brecher did in fact open her account on November 2, Brecher Aff. ¶ 5. The letter easily could have been generated on November 2 and sent out the next day, or indeed, it could have been mailed on Sunday, even if it could not have been delivered then. Brecher offers no evidence that the "regular office practice was not followed or was carelessly executed." *Meckel*, 758 F.2d at 817. Thus, for purposes of this motion, Synchrony mailed and Brecher received the Initial Agreement, despite Brecher's denial.

*Second*, Brecher agreed to the terms of the Initial Agreement. The Initial Agreement states that "[i]f you participate in the Old Navy Rewards Program, you accept the following . . . Terms and Conditions." Koehler Aff., Ex. A. Regular use of an account is sufficient to establish consent to the terms of the agreement governing it. *See Bakon v. Rushmore Serv. Ctr., LLC*, 2017 WL 2414639, at *2 (E.D.N.Y. June 2, 2017). A signature is not required. *Id.* at *3; *see also Genesco,*

*Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987) ("[I]t is well-established that a party may be bound by an agreement to arbitrate even absent a signature."). Moreover, the Initial Agreement refers to participation in the rewards program—not use of a physical card—as the prerequisite to acceptance of the "Terms and Conditions." Brecher does not dispute that she used the account from 2008 through at least 2015. Thus, she assented to the terms of the Initial Agreement.

She also consented to abide by the terms of the Agreement. The Agreement states that "by opening or using your account, you agree to the terms of the entire Agreement." Koehler Aff., Ex. B. As noted above, use of an account constitutes consent to the terms governing it, and Brecher used her account even after the 2012 change in terms. *See id.*, Ex. C. The Koehler affidavit indicates that the Agreement was mailed to Brecher in accordance with Koehler's standard policies, *id.* ¶ 9, but, even if Brecher did not receive these terms (and, for the reasons set forth above, I presume she did), "actual receipt of an arbitration agreement need not be proven to enforce it." *Bakon*, 2017 WL 2414639, at *2. Regular use of the account, like Brecher's, suffices. *Id.*

Consequently, Brecher's claim that she never agreed to be bound by a contract with Synchrony for a Gap credit account is incorrect. Although her initial Agreement was indeed with Old Navy and GE Capital Retail Bank, *see, e.g.*, Brecher Aff. ¶ 15, that account is one and the same as the Synchrony/Gap account ultimately sold to Midland. As explained above, Synchrony *is* GE Capital Retail Bank. *See* Koehler Aff. ¶ 2. The mere fact that the entity rebranded does not void Brecher's agreement to arbitrate. *See, e.g.*, *Biggs*, 2018 WL 1225539, at *1 (upholding arbitration agreement where Synchrony issued a credit account while known as GE Capital Retail Bank). Moreover, each of the account statements Brecher received state that payment should be made to "Synchrony/Old Navy," and Brecher made a payment to Synchrony/Old Navy, indicating

that she was aware of the bank's name. *See, e.g.*, Koehler Aff., Ex. C. And while the Agreement is titled "Gap Inc. Credit Card Account Agreement," it also applies to "Old Navy Credit Card Accounts," such as Brecher's. *Id.*, Ex. B.

*Finally*, Brecher contends that "New York law does not allow a bank to unilaterally amend revolving credit agreements" like Brecher's credit card account. Pl.'s Br. 26. First, the Initial Agreement put Brecher on notice that disputes would be subject to arbitration and that the terms of any agreement might be amended. *See* Koehler Aff., Ex. A. Additionally, while "merely continuing to owe money on a credit card account cannot reasonably be understood to be an objective manifestation of intent that binds the parties to a change in terms," *Kulig v. Midland Funding, LLC*, 2013 WL 6017444, at *6 (S.D.N.Y. Nov. 13, 2013) (quotation marks omitted), Brecher did not merely continue to owe money after receiving the amended Agreement. Rather, she made payments after receiving the Agreement. *See* Koehler Aff., Ex. C. This is sufficient to bind her to its terms, including the arbitration provision.

In sum, even if the Initial Agreement was with Old Navy and GE Capital Retail Bank, the legal right to collect on the debt properly passed to Synchrony Bank and, ultimately, Midland. Brecher used her credit account both before and after she received the Agreement, binding her to its terms as well. Thus, a valid agreement to arbitrate exists.

C. *Assignment of the Debt*

Brecher contends that "Midland has not shown that it has a valid assignment of the purported debt." Pl.'s Br. 24. Specifically, Brecher argues that the "documentary evidence of sale is incomplete" both because there is no evidence that Synchrony sold Brecher's account to Midland and because Midland has failed to provide a "closing statement." *Id.* These bases for opposing Midland's motion are too flimsy to support Brecher's position.

Arbitration contracts may be enforced "not only by the original parties but also by assignees." *Lipman v. Haeuser Shellac Co.,* 289 N.Y. 76, 81 (1942); *see also Biggs*, 2018 WL 1225539, at *7. "A party must prove assignment of a contract by a preponderance of the evidence." *Zambrana v. Pressler & Pressler, LLP*, 2016 WL 7046820, at *5 (S.D.N.Y. Dec. 2, 2016); *cf. Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993) (holding that existence of contract must be established by a preponderance).

The Agreement authorizes Synchrony—then operating under the name GE Capital Retail Bank—to "sell, assign or transfer any or all of our rights or duties under this Agreement or our account, including our rights to payment." Koehler Aff., Ex. B. Accordingly, Synchrony had the right to transfer Brecher's account to Midland. Brecher does not disagree with this point; rather, she contends that Midland fails to establish that Synchrony validly assigned its rights in the Agreement and her account to Midland.

The documentary evidence submitted by Midland would be sufficient to establish that Synchrony transferred its rights to Midland. Midland submitted a Bill of Sale and an Affidavit of Sale indicating that Synchrony sold its rights and "a pool of charge-off accounts" to Midland in addition to providing Midland with "records . . . on individual [a]ccounts." Mulcahy Aff., Ex A. Midland also presented a copy of the information transferred to Midland "identifying Sara Brecher's debt as one of the purchased debts within the portfolio received from Synchrony." *Id.* ¶ 7 & Ex. B. Indeed, the Complaint alleges that Midland sent Brecher a letter seeking to collect on the debt acquired from Synchrony, *e.g.*, Compl. ¶ 13, which Midland could not have done without first receiving her debt and contact information from Synchrony.

Brecher's primary attack on the legitimacy of these documents is that they contain conflicting dates. But both the Bill of Sale and Affidavit of Sale list July 19, 2016 as the date of

transfer. *See* Mulcahy Aff., Ex. A. That the Bill of Sale also lists the date of the agreement as July 21, 2015 does not discredit the entire document. *See id.* Likewise, defendants' notation on the copy of the record identifying Brecher's debt that states the record was "transferred on or about [July 27, 2016]" does not undermine the trustworthiness of the record. *See id.*, Ex. B. All other data contained in the record comports with affidavits and statements made elsewhere. *Compare id. with id.*, Ex. D (same last payment amount and last payment date); Brecher Aff. ¶ 5 (identifying date of credit card application as one day before account contract date).

Brecher offers no other persuasive evidence and has failed to demonstrate that there is any meaningful dispute as to whether Synchrony assigned her account to Midland. Accordingly, Midland may enforce the arbitration provision.

D. *Validity of the Arbitration Provision and Class Action Waiver*

Brecher does not meaningfully challenge the validity of the arbitration provision and class waiver or argue that her claims are outside of their scope. Nor could she. "In the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584-85 (1960). Where, as here, the arbitration provision governs "any dispute or claim" "if it relates to [an] account," and only excepts cases filed in small claims court or cases filed by defendants to collect money owed, Koehler Aff., Ex. B, FDCPA claims fall within the provision's scope. *See Biggs*, 2018 WL 1225539, at *5 n.4. Similarly, class action waivers, like the one in the Agreement, are valid and enforceable. *Shetiwy v. Midland Credit Mgmt.*, 959 F. Supp. 2d 469, 474-75 (S.D.N.Y. 2013) ("[A] generalized congressional intent to vindicate statutory rights [such as those in the FDCPA] cannot override the FAA's mandate that courts enforce arbitration clauses, including those with class action waivers,

as written.") (citing *Am. Express Co. v. Italian Colors Restaurant*, 570 U.S. 232-33 (2013)); *see also Tsadilas v. Providian Nat'l Bank*, 786 N.Y.S.2d 478, 480 (App. Div. 2004) ("The arbitration provision is enforceable even though it waives plaintiff's right to bring a class action.").

E. *Stay of the Action*

Although defendants seek dismissal of plaintiff's claims, the FAA "mandate[s] a stay of proceedings when all of the claims in an action have been referred to arbitration." *See Katz v. Cellco P'ship*, 794 F.3d 341, 345-47 (2d Cir. 2015); *see also* 9 U.S.C. § 3 ("[T]he court . . . shall . . . stay the trial of the action until such arbitration has been held . . . ."). Thus, a stay, rather than dismissal, is appropriate.

**CONCLUSION**

Defendants' motion to compel arbitration on an individual basis is granted. Plaintiff's class action claims are dismissed. Her remaining claims are stayed until such arbitration has been held.

                                       **SO ORDERED.**

                                       *Edward R. Korman*

Brooklyn, New York                                   Edward R. Korman
March 13, 2019                                          United States District Judge